## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACKSON PAVELKA, on behalf of himself and all others similarly situated,<br>            *Plaintiff*,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC.,<br>            *Defendant*. | No. 3:20-cv-01557 (MPS) |

## RULING ON MOTION TO DISMISS

Plaintiff Jackson Pavelka, individually and on behalf of all others similarly situated, has filed suit against Defendant Charter Communications, Inc. ("Charter") alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*.  He also brings claims for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*., and for unjust enrichment.  Charter has moved to partially dismiss Pavelka's TCPA claims for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and to dismiss Pavelka's state law claims for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6).  For the reasons discussed below, Charter's motion is GRANTED in part and DENIED in part.

## I.      BACKGROUND

### A.  Phone Calls

On March 18, 2019, Pavelka, a Texas resident, successfully registered his cellphone number, (817) XXX-4635, with the National Do Not Call Registry.  ECF No. 28 at 2 ¶ 5, 3 ¶ 7.[1] On or around the morning of February 25, 2020, Charter, which has its principal place of

---

[1] This ruling cites ECF page numbers throughout.

business in Stamford, Connecticut, contacted Pavelka on his cellphone to communicate with him regarding the purchase of television, internet, and/or voice services from Charter's Spectrum brand. *Id.* at 2 ¶ 6, 3 ¶ 8. The call came from (817) XXX-2454, which Pavelka alleges is an internet-generated spoof number starting with the same area code prefix (817) as Pavelka's own cellphone number. *Id.* Pavelka asked Charter's representative for a callback number and was given (915) XXX-0849, a different number from the one that called Pavelka. *Id.* at 3 ¶ 9. The next day, Charter again called Pavelka on his cellphone to communicate regarding the purchase of Spectrum services. *Id.* at 3 ¶ 10. This phone call came from (817) XXX-9154, which Pavelka alleges is internet-generated spoof number starting with the same area code prefix (817) and initial three digits as Pavelka's own cellphone number. *Id.* When Pavelka answered this call, he heard a recorded voice. *Id.* at 3 ¶ 11. Upon pressing "1" to speak to a representative, Pavelka heard a distinct pause, and there was a delay before a live person started speaking. *Id.* Pavelka claims that this kind of delay is indicative of an automated telephone dialing system. *Id.* During this phone call, Pavelka verbally agreed to schedule an installation appointment. *Id.* at 3 ¶ 12. He then received an order confirmation number, and Spectrum made an attempt to charge the Visa card he provided. *Id.*

On or around March 16, 2020, Charter again called Pavelka on his cellphone to communicate regarding the purchase of Spectrum services. This phone call came from (817) XXX-6096, which Pavelka alleges is an internet-generated spoof number with the same area code prefix (817) and initial three digits as Pavelka's own cellphone number. *Id.* at 3 ¶ 13. The same thing occurred later that same day, this time from (817) XXX-2430, another an internet-generated spoof number with the same area code prefix (817) and initial three digits as Pavelka's cellphone number. *Id.* at 4 ¶ 14. Charter contacted Pavelka via his cellphone a third time on

March 16.  *Id.* at 4 ¶ 15.  This call came from (888) XXX-1995, the phone number for an authorized Charter Spectrum retailer located in Castle Rock, Colorado.  *Id.*  When Pavelka answered, the caller asked him if he wanted to purchase services, but Pavelka was unable to pay for the services up front.  *Id.*  At the end of the call, Pavelka verbally requested that Charter not contact him again.  *Id.*

The next morning, Charter again called Pavelka on his cellphone.  *Id.* at 4 ¶ 16.  This call came from (407) XXX-2518, which Pavelka alleges is an internet-generated spoof number.  *Id.*  Pavelka again verbally requested that Charter not contact him again.  *Id.*

Two days later, Charter called Pavelka on his cellphone.  *Id.* at 4 ¶ 17.  This call came from (844) XXX-0145, Charter's automated service number.  *Id.*  Pavelka listened to the recorded prompts and pressed "3" to cancel his installation appointment.  *Id.*  He heard a recording that said, "Please hold while I transfer you to a representative."  *Id.*  Pavelka hung up the call before speaking with a live person.  *Id.*

The next day, Pavelka received another phone call from Charter's automated service number.  *Id.* At 4 ¶ 18.  Pavelka again listened to the recorded prompts and again pressed "3" to cancel his installation appointment.  *Id.*  After pressing "3," he heard another recorded prompt that said, "Press 1 if you wish to cancel."  *Id.*  Pavelka pressed "1" and heard a voice beginning to say something, but he hung up.  *Id.*  Later that afternoon, Pavelka received another automated telephone call from Charter's automated service number.  *Id.* at 5  ¶ 19.  Pavelka did not answer the call, but the resulting voicemail left on his cellphone said "Hello. This is Spectrum. Your Spectrum technician Christopher is en route to your appointment…" *Id.*

On or around March 30, 2020, Charter contacted Pavelka on his cellphone, this time from (585) XXX-8862, which Pavelka alleges is an internet-generated spoof number.  *Id.* at 5 ¶ 20.

Pavelka again verbally requested that Charter not contact him again. *Id.* The same occurred on April 8, 2020, this time from (740) XXX-6196, another internet-generated spoof number. *Id*. at 5 ¶ 21.

On April 10, 2020, Charter contacted Pavelka on his cellphone, this time from (334) XXX-4032, the listed telephone for an authorized Charter Spectrum retailer located in Selma, Alabama. *Id.* at 5 ¶ 22. Pavelka again verbally requested that Charter not contact him again. Id. On November 24, 2020, Charter contacted Pavelka on his cellphone in an attempt to communicate with him regarding the purchase of television, internet, and/or voice services from Charter's Spectrum brand. *Id.* at 5 ¶ 23. This call came from (817) XXX-3558, which Pavelka alleges is an internet-generated spoof number with the same area code prefix (817) as his cellphone number. Id. When Pavelka answered this call, he heard a recorded voice. *Id*. at 5 ¶ 24. After pressing "1" to speak to a representative, he was connected to a live person. Id. Pavelka asked this person for a callback number but was given only the area code "845" before the representative ended the call. *Id.*

On or around the afternoon of December 5, 2020, Charter contacted Pavelka on his cellphone regarding the purchase of Spectrum services. *Id.* at 6 ¶ 25. This call came from (888) XXX-0216. *Id*. When Pavelka answered the call, a live sales representative asked Pavelka if he had reached "Jackson." *Id.* at 6 ¶ 26. When Pavelka confirmed that his name is Jackson, the representative informed him that Spectrum was offering a special promotion for Pavelka's address. *Id.* Pavelka asked the representative what address that was, and the representative provided Pavelka's former address. *Id.* Pavelka then verbally requested that he be placed on Charter's "do not call" list and that Charter stop contacting him. *Id.* at 6 ¶ 27.

4

On or around the morning of December 8, 2020, Charter contacted Pavelka on his cellphone from (800) XXX-8891.  *Id.*  When Pavelka answered the call, a live sales representative asked Pavelka if he had reached "Jackson."  *Id.*  After Pavelka confirmed that his name is Jackson, there was a crackly interference that prevented Pavelka from hearing the representative, and he ended the call.  *Id.* at 6 ¶ 28.

### B.  Text Messages

On or around the afternoon of September 18, 2020, Charter sent Pavelka a text message in an attempt to communicate with him regarding the purchase of Spectrum services.  *Id*. at 6 ¶ 29.  The text message came from (915) XXX-2318, which Pavelka alleges is an internet-generated spoof number.  *Id.*  On October 1, 2020, Charter again texted Pavelka on his cellphone to communicate regarding the purchase of services, this time from (833) XXX-0263, a toll-free number.  *Id.* at 6 ¶ 30.  The same thing occurred on October 21, 2020.  *Id*. at 7 ¶ 31.

### C.  Widespread Practice

Pavelka alleges that Charter has made unlawful robocalls to a wide class of persons, pointing to posts on Reddit and the Better Business Bureau website, as well as similar lawsuits filed in this and other districts.  *Id.* at 7 ¶ 33 - 8 ¶ 37.  Pavelka claims that these unlawful calls are "not an isolated event but part of a clear, organized and systemic pattern or practice emanating from [Charter's] corporate headquarters in Stamford Connecticut."  *Id.* at 9 ¶ 38.

### D.  This Lawsuit

Pavelka filed suit against Charter in October 2020.  On February 5, 2021, Pavelka filed an amended complaint that claims that Charter violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*  ECF No. 28.  The complaint also alleges that Charter was

unjustly enriched as a result of these violations. *Id.* Charter then filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF No. 31. Pavelka responded, ECF No. 34, and Charter filed a reply, ECF No. 36. The parties have filed several notices of supplemental authority. ECF Nos. 40, 42, 43, and 44.

## II.   MOTION TO DISMISS

Charter moves to dismiss all of Pavelka's TCPA claims based on calls made between November 2, 2015 and July 6, 2020 for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Charter argues that its motion is appropriately brought pursuant to Rule 12(b)(1)—rather than Rule 12(b)(6)—because a claim is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the claim. ECF No. 31-1 at 7. This Court lacks such power, Charter argues, because the provision of the TCPA upon which Pavelka bases his claims was held unconstitutional by the Supreme Court in *Barr v. American Association of Political Consultants, Inc. ("AAPC")*, 140 S.Ct. 2335 (2020). "The 'inadequacy' of a federal claim is ground for 'dismissal for lack of subject-matter jurisdiction ... only when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 150 (2d Cir. 2003) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)) (cleaned up). But the Supreme Court has held that a "district court has jurisdiction if the right of [a] petitioner[] to recover under [his] complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if given another." *Steel Co.*, 523 U.S. at 89 (internal quotation marks omitted). Here, Pavelka's right to recover may be sustained if the TCPA is given one construction in light of the Supreme Court's decision in *AAPC*, and it will be defeated if the

TCPA is given another construction.  Thus, dismissal for lack of subject-matter jurisdiction is inappropriate here.  Instead, the Court will treat the defendant's motion as one under Rule 12(b)(6).  *See Lindenbaum v. Realgy, LLC.*, 2021 WL 4097320, at *2 (6th Cir. Sept. 9, 2021) (treating motion to dismiss brought under 12(b)(1) as one under 12(b)(6) because if the plaintiff's "arguments about the continuing vitality of the robocall restriction from 2015 to 2020 [we]re correct, she [would be] entitled to relief").

## III.    LEGAL STANDARD

In assessing a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims."  *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004); *Ashcroft*, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions.")

## IV.    DISCUSSION

**TCPA Claims**

Charter moves to dismiss all of Pavelka's TCPA claims based on calls made between November 2, 2015 and July 6, 2020. As noted above, the Court will treat this motion as one under Rule 12(b)(6) for failure to state a claim.

The TCPA was enacted in 1991. *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 1462, 105 Stat. 2394 (1991) (codified at 27 U.S.C. § 227, *et seq*.). The statute, as originally enacted, bars "any person" from "mak[ing] any call … using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service … or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1). This language, known as the "robocall restriction," "prohibit[s] almost all robocalls to cell phones." *See AAPC*, 140 S. Ct. at 2344. In 2015, Congress amended the robocall restriction to create an exception for calls "made solely to collect a debt owed to or guaranteed by the United States …". *See* Bipartisan Budget Act of 2015, Title III, § 301, 129 Stat. 584, 588 (2015). That change was signed into law on November 2, 2015.

In *AAPC*, a group of political organizations filed a declaratory judgment action against the U.S. Attorney General and the Federal Communications Commission ("FCC"), claiming that the robocall restriction with the government-debt exception violated the First Amendment. *See AAPC*, 140 S.Ct. at 2345. When the case reached the Supreme Court, six of its members concluded that Congress "impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment" when it added the government-debt exception. *Id.* at 2343. Rather than give the political organizations the relief they sought (invalidation of the entire robocall restriction), seven members of the Court concluded that "the entire 1991 robocall restriction should not be invalidated, but rather that the 2015 government-debt exception must be invalidated and severed from the remainder of the statute." *Id.* Only three justices explained

8

why severance was appropriate; the other four justices joined in the three-justice plurality's conclusion regarding severance but did not explain why they agreed with that conclusion.

Charter argues that the Supreme Court's holding in *AAPC* requires that this Court dismiss Pavelka's TCPA claims to the extent they rely on calls allegedly placed after the government-debt exception was added on November 2, 2015 but before the Court's decision in *AAPC* on July 6, 2020.[2]  In support, Charter argues that the *AAPC* holding declared the entire robocall restriction—not just the government-debt exception—unconstitutional.  *See* ECF No. 31-1 at 9 ("Plaintiff's action is based primarily on alleged violations of the automated-call restriction prior to July 6, 2020, at a time during which the Supreme Court in *AAPC* determined this restriction was content-discriminatory and unconstitutional…".).  According to Charter, the Court's decision to sever the government-debt exception from the robocall restriction applies prospectively only.  *See id.* at 19 ("[T]he Supreme Court's severance of the government debt exception cured the restriction's infirmity on a prospective basis.  But it did not (and could not) cure the infirmity with respect to calls made during the time the law was unconstitutional—at the time it impermissibly favored one group of speakers over another.").

Charter's argument proves unsuccessful.  This Court joins the majority of district courts and the only federal appellate court that have addressed this issue in concluding that the robocall prohibition of the TCPA may be constitutionally applied to defendants (other than collectors of government debt) who made robocalls between the adoption of the government-debt exception

---

[2] Because the complaint alleges that Charter made some of the calls (and sent all of the text messages) after July 6, 2020, Charter seeks only "to partially dismiss" the two TCPA claims set forth in Counts One and Two.  ECF No. 31 at 1.  It is doubtful that Rule 12(b)(6) authorizes a court to dismiss part of a single claim.  *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F.Supp.3d 94, 101-103 (E.D.N.Y. 2018) (holding that motion to dismiss challenging three out of four alleged market definitions supporting antitrust claim was not a proper motion to dismiss because it did not seek to dismiss an entire claim); *Schechter v. Alpert*, No. 5-cv-10638(CLB), 2006 WL 8461750, at *3 (S.D.N.Y. Mar. 14, 2006) (observing that "Rule 12 does not extend to partial dismissal of a claim as time barred only in part").  Nonetheless, because I conclude that the motion to dismiss lacks merit, I do not decide whether partial dismissal of a claim would be proper.

and the Supreme Court's decision in *AAPC*. *See Lindenbaum v. Realgy*, 2021 WL 4097320 (6th Cir. 2021); *Marshall v. Grubhub Inc.*, No. 19-cv-3718, 2021 WL 4401496, at *3 (N.D. Ill. Sep. 27, 2021) (collecting cases); *Roeder v. Collection Bureau of the Hudson Valley, Inc.*, No. 20-cv-6200(JCM), 2021 WL 3888127, at *6 (S.D.N.Y. Aug. 31, 2021). This conclusion is supported by the text of the plurality opinion in *AAPC*, which this Court finds persuasive, as well as by longstanding Supreme Court precedent.

First, the *AAPC* plurality's discussion of severance supports the conclusion that the robocall provision may be applied to Charter for calls made between the adoption of the government-debt exception and *AAPC*. Charter highlights a quotation from the plurality opinion in support of its argument that the *AAPC* decision held the entirety of the robocall provision unconstitutional during the period after the government-debt exception was added but before the *AAPC* decision and that the Court's severance of the government-debt exception applied prospectively only. *See AAPC*, 140 S.Ct. at 2346 ("The initial First Amendment question is whether the robocall restriction, with the government-debt exception, is content-based. The answer is yes."). But the plurality opinion elsewhere indicates that it is declaring the government-debt exception, rather than the robocall restriction as a whole, unconstitutional. *See id*. at 2352 ("Enacted in 2015, *the government-debt exception* added an unconstitutional discriminatory exception to the robocall restriction. The text of the severability clause squarely covers the *unconstitutional government-debt exception* and requires that we sever it.") (emphasis added).

More importantly, broader discussion within the plurality opinion indicates that the plurality did not seek to declare the entire robocall restriction unconstitutional during the period after the government-debt exception was added but before the *AAPC* decision. For example, the

plurality opinion emphasizes that it seeks to give effect to the severability clause contained in the statute, which provides: "If any provision of this chapter [meaning the 1934 Communications Act] or the application thereof to any person or circumstances is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances *shall not be affected thereby*." 47 U.S.C. § 608 (emphasis added); *see also AAPC*, 140 S.Ct. at 2352-54. It also points out that the Court's precedents regarding severance—dating back to *Marbury v. Madison*—counsel in favor of "surgical severance rather than wholesale destruction." *AAPC* at 2350-51. And it emphasizes that "[c]onstitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Id.* at 2351. Nowhere in the opinion does the plurality indicate that it seeks to sever the government-debt exception prospectively only, and interpreting the opinion in that manner would produce the exact situation the plurality appeared eager to avoid. It would cause the Court's decision invalidating a portion of the statute to affect the remainder of the statute, at odds with Congressional intent. It would destroy the robocall restriction "wholesale" for a five-year period. And it would permit litigants—here, Charter—to ride the discrete constitutional flaw created by the government-debt exception to take down the entire, otherwise constitutional, robocall provision. Thus, Charter's argument is unsupported by the plurality's discussion of severance.

Of course, the other justices that concurred in the plurality's conclusion regarding severance did not explain why they agreed with that decision. But other Supreme Court precedent, some of which is discussed in the *AAPC* plurality opinion, supports this Court's conclusion. The Supreme Court has long recognized that judicial interpretations of statutes generally apply retroactively. *See Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993)

("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."); *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 311-312 (1994) ("The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student.") (quoting *United States v. Security Industrial Bank*, 459 U.S. 70, 79 (1982)).  This principle stems from the concept—articulated by the Court in *Marbury v. Madison*—that it is a court's power is to "say what the law is."  5 U.S. 137, 177 (1803).  Thus, when the Court interprets a statute, "it is explaining its understanding of what the statute has meant continuously since the date when it became law."  *Rivers*, 511 U.S. at 313 n. 12.  And "like any judicial interpretation, a court's severability analysis is subject to the 'fundamental rule of retrospective operation that has governed judicial decisions for near a thousand years.'" *Lindenbaum*, 2021 WL 4097320, at * 3 (quoting *Harper*, 509 U.S. at 94) (cleaned up).  Thus, Charter's argument that the *AAPC* Court's decision to sever the government-debt exception does not apply retroactively is at odds with Supreme Court precedent regarding retroactive application of judicial interpretations of statutes.

Charter's argument is also at odds with the related principle, discussed by the *AAPC* plurality, that unconstitutional amendments are nullities that are void when enacted and, therefore, have no effect on the preexisting statutes they seek to amend.  The Court has long held that "a legislative act contrary to the constitution is not law."  *Marbury*, 5 U.S. at 177; s*ee also Ex parte Siebold*, 100 U.S. 371, 376 (1879) ("An unconstitutional law is void, and is as no law.").  "Echoing *Marbury*, the Court in *Frost* [*v. Corp. Comm'n of Okla.*] explained that an unconstitutional statutory amendment 'is a nullity' and 'void' when enacted, and for that reason

has no effect on the original statute." *AAPC*, 140 S.Ct. at 2353 (plurality opinion) (quoting *Frost*, 278 U.S. 515, 526-527 (1929)).  Likewise, in *Eberle v. Michigan*, the Court held that amendments to a state law generally prohibiting the manufacture of alcohol that created exceptions for wine and cider, which the state supreme court had held "void as unlawful discrimination," were severable from the general prohibition.  *Eberle*, 232 U.S. 700, 703 (1914).  Further, the Court affirmed the convictions of persons charged with manufacturing beer in violation of the general prohibition during the period after the wine-and-cider amendments were added but before the state supreme court declared them void.  *Id.* at 703-706; *see also AAPC*, 140 S.Ct. at 2353 (In cases "where Congress added an unconstitutional amendment to a prior law," "the Court has treated the original pre-amendment statute as the valid expression of the legislative intent" (internal quotation marks omitted)).

Charter is unable meaningfully to distinguish this case from *Frost* and *Eberle*, and the additional cases it cites in support of its position are either distinguishable from this one or otherwise do not help it.  For instance, Charter relies heavily on the Supreme Court's holding in *Grayned v. City of Rockford*, 408 U.S. 104 (1972), where a defendant convicted under an antipicketing ordinance appealed his conviction, arguing that the statute under which he was convicted violated the Equal Protection Clause because it carved out an exception for picketing regarding school labor disputes.  *Id.* at 107.  The Court noted that the legislature's removal of the exception after the defendant's conviction but before the Court decided the case did not affect the Court's analysis, noting "[n]ecessarily, we must consider the facial constitutionality of the ordinance in effect when appellant was arrested and convicted."  *Id.* at 107 n.2.  But in *Grayned*, there was no suggestion that the offending provision had resulted from an unconstitutional amendment to a preexisting constitutional statute, and in any event the Supreme Court has

treated *Grayned* as limited to the context of a criminal defendant who is convicted under a statute that at the time of the conviction is unconstitutionally discriminatory.  In *Sessions v. Morales-Santana*, the Court (in a footnote) treated *Grayned* as an exception—one limited to criminal defendants convicted under discriminatory laws—to the general principle that the legislature's intent should guide the Court's decision between the two possible fixes for an unconstitutionally discriminatory statute: "declar[ing] the statute a nullity and order[ing] that its benefits not extend to the class that the legislature intended to benefit" or "extend[ing] the coverage of the statute to include those who are aggrieved by exclusion."  137 S.Ct. 1678, 1698 (2017).  As in *AAPC*, the *Morales-Santana* Court determined that the legislature intended that it select the former option, noting that "[i]n making this assessment, a court should measure the intensity of the commitment to the residual policy—the main rule, not the exception—and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation"  *Id.* at 1700 (internal quotation marks omitted).  But in the footnote discussing *Grayned*, the Court indicated that for criminal defendants convicted under discriminatory laws, legislative intent was not the touchstone: "We note, however, that a defendant convicted under a law classifying on an impermissible basis may assail his conviction without regard to the manner in which the legislature might subsequently cure the infirmity . . . . It was irrelevant to the Court's decision [in *Grayned*] whether the legislature likely would have cured the constitutional infirmity by excising the labor-dispute exemption . . . ."  *Id.* at 1699 n.24.  Charter, of course, is not a criminal defendant, and so *Grayned* does not help it here.

In addition, application of the test articulated in *Morales-Santana* favors Pavelka.  The "residual policy" or "main rule" here prohibits robocalls, and the Court's decision in *AAPC* leaves no doubt about the "intensity of commitment" to this policy: "Americans passionately

disagree about many things.  But they are largely united in their disdain for robocalls . . . . For nearly 30 years, the people's representatives in Congress have been fighting back [against robocalls] . . . . [Adoption of the TCPA in 1991] responded to a torrent of vociferous consumer complaints about intrusive robocalls . . . . A leading Senate sponsor of the TCPA captured the zeitgeist in 1991, describing robocalls as 'the scourge of modern civilization . . . .'"  *AAPC*, 140 S.Ct. at 2343-44.  Further, there is no doubt that "the degree of potential disruption of the statutory scheme" from abrogating the government debt exception would be far less than from extending immunity to all robocallers during the five-year period at issue.  The former would leave Congress's intended protection against robocalls in place for all but government debt collectors (who would be exempted not by virtue of the unconstitutional exemption but by virtue of their due process reliance interests, *see AAPC*, 140 S.Ct. at 1355 n.12), while the latter would scotch all of that protection for a five-year period.  In *Morales-Santana*, the Court similarly concluded that it was the exception, rather than the main rule, that had to go: "Extension [of a discriminatory, shorter residence-in-the-United-States requirement for acquisition of citizenship by children of unwed, U.S.-citizen mothers than for children of unwed, U.S.-citizen fathers] would render the special treatment Congress prescribed [in the provision favoring mothers] the general rule, no longer an exception.  [The main rule] must hold sway."  137 S.Ct. at 1701.  Thus, *Morales-Santana* supports Pavelka's position and suggests that *Grayned* is limited to the impact of a subsequent legislative change to a statute on a criminal conviction under the prior version of the statute.[3]

_____

[3] The Court's decision in *Morales-Santana* is unhelpful to Charter for an additional reason.  It indicates that even if the decision to sever the government-debt exception applied prospectively only, the robocall provision could still be applied against Charter for calls made during the period when the debt exception was in effect.  In *Morales-Santana*, the Court held that a statutory requirement that applied to children of unwed, U.S. citizen fathers but not to those of unwed, U.S. citizen mothers, violated the Equal Protection Clause.  137 S.Ct. at 1698.  The Court addressed that violation by eliminating the exception for children of unwed, U.S. citizen mothers, but it held that the exception would be eliminated on a prospective basis only.  *Id.* at 1700-1701.  It nevertheless denied relief to the petitioner, the

Finally, the Court's decisions in *United States v. Arthrex* and *Seila Law, LLC v. Consumer Financial Prot. Bureau*, which Charter also cites as support, do not indicate that decisions regarding severance apply only prospectively or that unconstitutional amendments to existing statutes are not void when enacted.  Rather, both decisions severed unconstitutional statutory provisions and then remanded to a lower court or government agency for further adjudication in light of that severance.  *Arthrex*, 141 S.Ct. 1970, 1986-1989 (2021); *Seila Law*, 140 S.Ct. 2183, 2207-2211 (2020).  Recognition that unconstitutional statutory provisions may have practical effects that must be addressed does not undermine the general principle that such provisions are void from the date of enactment and that judicial decisions so holding should be applied retroactively.

In sum, the *AAPC* plurality opinion and longstanding Supreme Court precedent indicate that the robocall provision may be constitutionally applied against Charter for calls placed after the government-debt exception was added but before the *AAPC* decision was handed down.  As noted above, the statutory severance clause makes clear that this type of surgical correction that leaves unaffected the operation of other provisions of the statute is what Congress wanted.  And the equities, including First Amendment free speech values, do not command a contrary result.  Refusing to dismiss the TCPA claim in this case treats Charter no differently—and suppresses no more speech—than if Congress had not crossed a constitutional line by enacting the government-debt exception in the first place; in either event, the same speech by Charter—its robocalls—would be prohibited.  By contrast, dismissing the TCPA claim would flout Congress's intent in

---

child of an unwed, U.S. citizen father, indicating that the there was no constitutional issue in applying the requirement to him during a period when it could not be applied to the children of unwed, U.S. citizen mothers. *Id.* at 1698.  While *Morales-Santana* is an Equal Protection, not First Amendment, decision, it nonetheless indicates that statutes that unconstitutionally discriminate (whether against persons or speech) by excepting certain persons or speech from statutory requirements or prohibitions may still be applied against the persons or speech not subject to the unconstitutional exception if the exception is removed from the statute on a prospective basis.

enacting the TCPA in 1991 and bestow a windfall on Charter—a set of penalty-free, annoying robocalls touting its services to thousands of Americans—simply because of Congress's misstep in adding in 2015 an unconstitutional provision to the TCPA that never applied to Charter.[4]

## CUTPA Claim

Charter moves to dismiss Pavelka's CUTPA claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  I conclude that Pavelka's CUTPA claim must be dismissed because Connecticut law does not apply to this claim.  Under Connecticut choice of law principles, an unfair trade practices claim is "determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 558 (2016).  To determine which state has the most significant relationship, courts must consider four "black-letter rules of priority":

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* at 559.  These priority rules inform the following seven factors:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

---

[4] Because this Court denies Charter's motion to dismiss the TCPA claims, it does not address Pavelka's argument that Charter waived the right to contest the constitutionality of the robocall provision by not filing a notice under Fed. R. Civ. P. 5.1.

*Id.* at 558-59 (alteration omitted).

Just as the Connecticut Supreme Court did in *VitalWorks*, I conclude that the state of the plaintiff's residence, where the injury took place, has a more significant relationship "to the occurrence and the parties" than the state where the defendant corporation is headquartered. *Id.* at 558. First, (a), the injury occurred "where the plaintiff suffered the adverse consequences"— in this case, Texas. *Id.* at 559. Second, (b), while the injury-causing conduct can be "consequences of an earlier occurrence," *id.*, Pavelka does not sufficiently allege that the calls and text messages originated from Connecticut. Instead, he states that the calls and messages came from various non-Connecticut area codes and only alleges generally that Charter's conduct "demonstrates a widespread national pattern or practice … which clearly emanate from its corporate headquarters and nerve center." ECF No. 28 at 16 ¶ 73. Third, (c), residence is a "neutral factor" where the parties are located in two different states. *VitalWorks*, 322 Conn. at 560. Fourth, (d), the center of the relationship may not necessarily be Texas, but is certainly not Connecticut. Thus, each of the four priority rules are either neutral or weigh in favor of applying Texas law. Moreover, as the *VitalWorks* court explained, "although Connecticut undoubtedly has an interest in applying its law to ensure that local businesses do not engage in unfair trade practices in this state, that interest is not especially strong … in view of the limited nature of the contact that occurred between the parties in Connecticut." *Id.* at 561. On the other hand, the plaintiff's state of residence has a stronger "interest in protecting its citizens and commercial enterprises from unfair or deceptive trade practices." *Id.* Because Connecticut law does not apply to this unfair trade practices claim, it is dismissed.

Even if Connecticut law applied, Pavelka has not sufficiently alleged the "ascertainable loss of money or property" required by CUTPA. Conn. Gen. Stat. § 42-110g(a). "[T]o be

entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation . . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 218 (2008) (internal citations, quotation marks, and alteration omitted). Pavelka does not allege that he incurred any charges or suffered any economic harm from the calls and text messages he allegedly received from Charter. While the annoyance of receiving unwanted robocalls and text messages can provide Article III standing, it cannot satisfy the "ascertainable loss" requirement of CUTPA. *See Larobina v. Wells Fargo Bank, N.A.*, 632 F. App'x 55, 56-57 (2d Cir. 2016) (affirming dismissal of CUTPA claim because plaintiff did not show "ascertainable loss" based on emotional distress from debt collection calls); *Lundstedt v. I.C. System, Inc.*, No. 15-cv-824(JAM), 2017 WL 4281057, at  *5 (Sep. 27, 2017) (holding that plaintiff's allegations that he "sustained emotional injury from being subject to many debt collection calls" did not constitute "ascertainable loss"); *Bell v. Survey Sampling Int'l*, No. 15-cv-1666(MPS), 2017 WL 1013294, at *7 n.4 (D. Conn. 2017) (noting that it was unlikely plaintiff could prove ascertainable loss where plaintiff "incurred no charges or other economic harm" because of robocall).

The Connecticut decisions that Pavelka cites do not compel a different conclusion. The *Soto v. Bushmaster Firearms Int'l, LLC* case, which recognized that CUTPA permits recovery for personal injuries, involved the victims of the Sandy Hook shooting, whose families obviously incurred "ascertainable losses." 331 Conn. 53 (2019). The Connecticut trial court decision Pavelka cites refused to dismiss a CUTPA claim based on "invasion of privacy," noting that "no Connecticut appellate court has addressed the question of whether an intangible injury such as an invasion of privacy constitutes ascertainable loss," but providing no analysis of the issue.

*Bartolotta v. Simplicity Fin. Distributors, Inc.*, 2020 WL 2060554 (Conn. Super. Ct. Mar. 18, 2020).  The facts of that case, which involved unauthorized use by the defendants of the plaintiff's name and identity to market their business, are farther afield from those of this one than are the facts of *Larobina, Lundstedt*, and *Bell*.

**Unjust Enrichment Claim**

Charter also moves to dismiss Pavelka's unjust enrichment claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Unjust enrichment permits recovery that is "essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 451 (2009).  A plaintiff seeking such recovery "must prove (1) that the defendant[] w[as] benefited, (2) that the defendant[] unjustly did not pay the plaintiff[] for the benefits, and (3) that the failure of payment was to the plaintiff['s] detriment."  *Id.* at 451-452.  Charter argues that Pavelka has failed to allege that Charter retained a benefit.  ECF No. 31-1 at 21.  This Court agrees.

Pavelka makes only the conclusory allegation that Charter "obtained substantial benefit as a direct result of [its] invasion of the privacy of the Plaintiff and members of the Plaintiff class," ECF No. 28 at 17 ¶ 76.  He at no point specifies what that benefit was.  He does not allege that Charter received any money from him, directly or indirectly, noting only that Spectrum (a Charter brand) once "made an attempt" to charge his Visa card.  *Id.* at 3 ¶ 12.  There are no facts in the complaint suggesting that Charter received any benefit as a result of its interaction with him. While Pavelka argues in his response that he need not allege any loss, *see* ECF No. 34 at 29-30, that argument does not address his failure to allege that Charter retained any benefit.  Thus, Pavelka's unjust enrichment claim fails as a matter of law.

**IV.     CONCLUSION**

For the reasons set forth above, Charter's motion to dismiss is DENIED as to Pavelka's

TCPA claims and GRANTED as to his CUTPA and unjust enrichment claims.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                November 29, 2021